UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRITISH COLUMBIA LOTTERY
CORPORATION,

Plaintiff,

-v-

NEHEMIAH CHUN MA, *et al.*,

Defendants.

23-CV-649 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff British Columbia Lottery Corporation ("BCLC") brings this action against

Defendants Nehemiah Chun Ma and Gamesense, LLC ("Defendants"), asserting claims of

trademark infringement and false designation of origin pursuant to Sections 35 and 43(a) of the

Lanham Act, 15 U.S.C. §§ 1114, 1125(a); injury to business reputation and dilution pursuant to

Section 360-*l* of the New York General Business Law; and unfair competition and trademark

infringement under New York common law.  Before the Court is BCLC's motion for summary

judgment.  For the reasons that follow, the motion is denied.

I.     **Background**

       A.     **Factual Background**

       The following facts are drawn from BCLC's Rule 56.1 Statement (ECF No. 30 ("BCLC

SOF")), Defendants' Response to BCLC's Rule 56.1 Statement (ECF No. 40 ("Defs.' SOF.")),

Plaintiff's First Amended Complaint (ECF No. 11 ("FAC")), and Defendants' Memorandum in

Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 34 ("Opp.")).  These facts are

undisputed unless otherwise noted, and they are construed in the light most favorable to the

Defendants as the non-moving party.  *See Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023)

(citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

BCLC is a Canadian Crown Corporation that owns and operates GameSense, a program that promotes responsible gambling.  (BCLC SOF ¶ 1.)  Gamesense, LLC, is a limited liability company that sells video game accessories.  (*Id.* ¶ 22.)

In 2009, BCLC launched GameSense, an educational program that aims to combat the health and financial consequences that can arise from gambling addictions and other "problem gaming."  (BCLC SOF ¶¶ 4-5.)  BCLC has entered into licensing agreements with a range of casinos and state lottery corporations to offer GameSense programming (*id.* ¶ 8),[1] which can include physical GameSense information centers, giveaways of GameSense educational materials, in-person advising, television promotions, and social-media campaigns (*id.* ¶ 10). Licensees are given digital files created by GameSense and the licensee prints and places the materials themselves.  (Defs.' SOF ¶ 36).

The Massachusetts Gaming Commission requires Massachusetts casinos to provide on-site space for GameSense programming (Defs.' SOF ¶ 41).  GameSense is also used throughout MGM's seventeen Las Vegas properties, at an MGM property in Detroit, Michigan, and on MGM's online and mobile gaming platform and social media accounts.  (BCLC SOF ¶ 10.)

BCLC owns the registered trademark for GameSense in connection with "downloadable audiovisual presentations in the field of responsible gambling," "printed educational materials in the field of responsible gambling," and "providing educational information in the field of responsible gambling to casino patrons."  (*Id.* ¶ 2.)  The registered trademark (No. 5,042,200) is shown below:

---

[1] Licensees include MGM Resorts International Operations, Inc. ("MGM"); Massachusetts Gaming Commission; the Connecticut Lottery Corporation; the Colorado Lottery; the Kentucky Lottery; IGT Indiana, LLC; and the Oregon Lottery.  (BCLC SOF ¶ 8.)



(FAC ¶ 9.)

BCLC also has two applications pending before the U.S. Patent and Trademark Office ("USPTO") to register variations on its GameSense mark.  (BCLC SOF ¶ 3; FAC ¶ 9.)  The mark that is the subject of BCLC's pending application No. 90/648,961 is shown below:



(FAC ¶ 9.)  And the mark that is the subject of pending application No. 90/649,004 is shown below:

GAMESENSE

(*Id.*)

Nehemiah Chun Ma is a managing member of Gamesense, LLC, and came up with the company's name.  (FAC ¶ 5; Defs.' SOF ¶¶ 43-44.)  According to Ma, while gaming, he first came across the term "gamesense," a word referring to "someone with a good sense for spatial or situational awareness in a game."  (Defs.' SOF ¶ 43.)  Ma created Gamesense, LLC, ("Defendant Gamesense") to sell specialized gaming products such as computer mice, mouse pads, and keyboards.  (FAC ¶ 20; Mem. at 10.)  Defendant Gamesense's products are "especially [for] players of shooter style games, to enhance their playing experience."  (Opp. at 24.)

3

After coming up with the idea for the name "Gamesense," "Ma conducted a basic trademark search" and found the BCLC GameSense trademark "for educational goods and services in the field of responsible gambling." (Defs.' SOF ¶ 57.) Ma then applied for an "intent to use" trademark for Defendant Gamesense with the USPTO, in connection with "Computer peripherals; Mousepads; Virtual Reality headsets"; "Chairs"; "Game controllers in the nature of keyboards for computer games; Gaming Mice; Gaming headsets adapted for use in playing video games; [and] Audio and visual headsets for use in playing video games." (Mem. at 6; FAC ¶¶ 19-20.) The application was "approved for publication by the [USPTO] examining attorney who found no confusingly similar marks." (Opp. at 10; Defs.' SOF ¶ 44.)

On September 8, 2021, BCLC opposed Ma's application in front of the USPTO. (FAC ¶ 19.) During the opposition proceeding, Defendant Gamesense began to make and distribute gaming accessories with Defendant Gamesense's logo. (*Id.* ¶ 20.) They continue to market and sell these branded items. (*Id.*)

Defendant Gamesense's logo is shown below:



(ECF No. 11-4 at 4.)

## B.    Procedural History

BCLC commenced this action on January 25, 2023 (ECF No. 1), and filed its operative First Amended Complaint on March 31, 2023 (FAC). Defendants answered on April 15, 2023. (ECF No. 15.) BCLC moved for summary judgment on October 30, 2023. (ECF No. 23.) Defendants opposed the motion on November 20, 2023 (Opp.), and BCLC replied in support of its motion on December 4, 2023 (ECF No. 39).

## II.    Legal Standard

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In making this determination, a court must "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Friend*, 61 F.4th at 84 (internal quotation marks omitted).

## III.    Discussion

BCLC moves for summary judgment on all its Lanham Act claims, New York General Business Law claim, and New York common law claims.  Because BCLC's Lanham Act and New York common law claims hinge on whether Defendants' use of Defendant Gamesense's logo "is likely to cause consumer confusion," the Court first analyzes this threshold question. Next, the Court turns to BCLC's General Business Law claim of injury to business reputation and dilution.

### A.    Consumer Confusion

BCLC's Lanham Act and New York common law claims all require a showing that Defendant Gamesense's logo "is likely to cause consumer confusion as to the origin or association of the goods or services," *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135-36 (2d Cir. 2023), which is analyzed using the factors enumerated by the Second Circuit in *Polaroid Co. v. Polarad Electronics Co.*, 287 F.2d 492, 495 (2d Cir. 1961).  *See also Vans, Inc*, 88 F.4th at135-36 (applying *Polaroid* factors for trademark infringement under the Lanham Act);

5

*Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985) (same for false designation

of origin under the Lanham Act); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27,

34-35 (2d Cir. 1995) (same for common law unfair competition); *Standard & Poor's Corp. v.*

*Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) (same for common law trademark

infringement).

The eight *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the
> products and their competitiveness with one another; (4) evidence that the senior
> user may "bridge the gap" by developing a product for sale in the market of the
> alleged infringer's product; (5) evidence of actual consumer confusion; (6)
> evidence that the imitative mark was adopted in bad faith; (7) respective quality of
> the products; and (8) sophistication of consumers in the relevant market.

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir.

2016) (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir.

2009)).

Because all factors except the similarity of the marks present questions of fact over which

rational triers of fact could disagree, the *Polaroid* analysis indicates that none of the Lanham Act

or common law claims are appropriate to resolve at the summary judgment stage.

### 1.    Strength of the Trademark

"[T]he strength of a mark depends ultimately on its distinctiveness, or its origin-

indicating quality, in the eyes of the purchasing public." *RiseandShine Corp. v. PepsiCo, Inc.*,

41 F.4th 112, 120 (2d Cir. 2022) (internal quotation marks omitted).  Though incontestability

under 15 U.S.C. § 1115 is "conclusive evidence of the validity of the registered mark," the

Second Circuit has held that a district court, in analyzing strength of the trademark, "must look

beyond the incontestability of the mark to independent indicia of strength." *The Sports Auth.,
Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 961 (2d Cir. 1996).

The strength of a trademark "depends on whether the mark is generic, descriptive,
suggestive, arbitrary or fanciful." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391
(2d Cir. 1995).  Generic marks, or common names, are unprotectable, and descriptive marks are
unprotectable absent commercially acquired meaning. *RiseandShine Co.*, 41 F.4th at 120-21.
Suggestive and arbitrary or fanciful marks are protectable, though suggestive marks are afforded
"a narrower scope of protection" than arbitrary or fanciful ones. *Id.* at 121.

BCLC and Defendants disagree on the strength of BCLC's GameSense mark.  (Mem. at
10-11; Opp. at 16-19.)  BCLC is correct that a valid mark that has "been incontestable for five
years" weighs in favor of strength under the *Polaroid* test.  *The Sports Auth.*, 89 F.3d at 961.  But
15 U.S.C. § 1115(b) also limits incontestability to the "use [of] the mark on or in connection with
the goods or services specified in the affidavit filed under the provisions of section 1065 of this
title."  BCLC's relevant affidavit in connection to its valid mark (No. 5,042,000) states that the
mark is for "downloadable audiovisual presentations in the field of responsible gambling,"
"printed educational materials in the field of responsible gambling," and "providing educational
information in the field of responsible gambling to casino patrons."  (ECF No. 35-9 at 18-19.)
Thus, any additional strength given to trademark No. 5,042,000 would not apply outside of
BCLC's enumerated gambling-related activities in its affidavit.

Beyond the category of gambling, the inherent strength of the word "GameSense" is up
for debate.  Even assuming that "GameSense" is "suggestive" rather than "descriptive" and thus
subject to trademark protection, the strength of the mark, and thus the level of protection the law
provides, requires additional determinations of fact.  The Second Circuit in *RiseandShine Co. v.*

*PepsiCo* held that the suggestive mark "Rise Brewing" for a coffee company was still weak because the "mark so clearly evokes the claimed virtues of the product it references . . . ." 41 F.4th at 122. A rational juror could find the same to be true for "GameSense." "Sense" evokes sensibility, common sense, and good judgment, which reflect GameSense programming's end goal: to promote responsible and sensible gambling. (*See* FAC ¶ 11.) Of course, this connection between GameSense's mission and its name may be complicated by the different meanings of the word "sense," relevant here because of Defendant Gamesense's use of the term to mean "spatial or situational awareness." (Opp. at 25.) Ultimately, a trier of fact is better positioned to make these factual determinations than the Court at this stage.

Because there are genuine questions of material fact regarding the strength of the "GameSense" mark, this factor does not weigh in favor of granting summary judgment for BCLC. *See RiseandShine*, 41 F.4th at 124 ("Weak marks are entitled to only an extremely narrow scope of protection, unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion." (internal quotation marks omitted)).

      **2.**      **Similarity of the Marks**

"To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (internal quotation marks omitted). When identical wording is used in both marks, confusion among potential customers is more likely. *See The Sports Auth.*, 89 F.3d at 962; *cf. Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 133 (2d Cir. 2004) (noting that the addition of a chef's first name to a restaurant helped mitigate the similarity between otherwise identical names).

Defendant Gamesense argues that a USPTO examining attorney "found no confusingly similar marks" when it applied for "intent to use," even though GameSense's first trademark (No. 5,042,000) had already been registered and two more applications were pending.  (*See* Opp. at 10; Defs.' SOF ¶ 44; FAC ¶¶ 9, 19.)  However, given the identical wording in BCLC's "GameSense" mark and Defendant Gamesense's logo, as well as the fact that both remove the space between the two words, the similarity between these marks is obvious.  Further, considering the stylistic similarities between BCLC's registered mark (No. 5,042,000) and Defendant Gamesense's logo, shown below, the visual appearance also weighs in favor of similarity.  Both use a largely black and white color-scheme with a blocky, bold font.  And both use a capital "G" and a capital "S," though Defendant Gamesense's capitalization has more variation than GameSense's.

BCLC's registered trademark (No. 5,042,200):



(FAC ¶ 9.)

Defendant Gamesense's logo:



(ECF No. 11-4 at 4.)

Defendants point out that the marketing for GameSense at present utilizes a different color scheme—green and white with a softer font and more playful feeling.  (Opp. at 20-21.) Yet even with these stylistic changes, the marks are textually identical and graphically very similar.  Thus, the similarity factor weighs in favor of confusion.

### 3. Proximity of the Products and Their Competitiveness with Each Other

In determining the proximity of two products, courts consider "whether and to what extent the two products compete with each other[,] . . . the nature of the products themselves and the structure of the relevant market." *Vans, Inc.*, 88 F.4th at 140 (internal quotation marks omitted). Competitive proximity is measured in market proximity and geographic proximity, both of which "seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Brennan's*, 360 F.3d at 134.

GameSense's responsible gambling programming is put on in Massachusetts casinos in cooperation with the Massachusetts Gaming Commission (Defs.' SOF ¶ 41), and its educational information is distributed through similar gambling commissions in five other states (BCLC SOF ¶ 8). GameSense programming is also used in MGM casinos in Las Vegas and Detroit, and on MGM's online and mobile gaming platform. (*Id.* ¶ 10.) At one of these Las Vegas properties, MGM has opened an "Esports Arena." (ECF No. 28 at 19.)

Defendant Gamesense sells video game accessories targeted especially at "players of shooter style games." (Opp. at 10.) BCLC does not allege that Defendant Gamesense is directly connected to casino gambling.

BCLC's argument for proximity comes down to whether the market for video games sufficiently overlaps with in-person casinos and online gambling platforms such that proximity is satisfied. This is again a factual inquiry not appropriate to resolve at the summary judgment stage. Though BCLC produces expert testimony that there is a close connection between gambling and video games due to the rising trend of eSports betting (BCLC SOF ¶¶ 11-14), there remain unanswered questions of fact. Proximity turns on whether GameSense's programming reaches eSports gamblers; whether eSports betting impacts the same kind of shooter-style video

10

games on which Defendant Gamesense focuses; and whether, even if these overlaps exist, specialized accessories for playing video games would be competitively proximate to educational programming about responsible gambling on eSports.  BCLC has not addressed any of these questions.

Because questions of fact remain, and a rational juror could reasonably find that GameSense educational programming about responsible gambling and gambling addiction lacks sufficient proximity to a video game accessories brand that specifically targets players of shooter-style games, this factor weighs against granting summary judgment.

### 4.    Bridging the Gap

Though BCLC does not allege that it intends to "bridge the gap" between GameSense's current market of responsible gambling education and Defendant Gamesense's market of video game accessories (Mem. at 18-19), the Second Circuit has stated that courts must also consider "assumptions of the typical consumer" that a company will bridge the gap.  *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir. 1996) (internal quotation marks omitted).  Given the lack of close proximity between these markets, with the possible exception of eSports betting discussed above, it does not seem likely that a typical consumer of GameSense programming would assume that the company would extend its services to producing specialized video game accessories.  But this is again a question of fact upon which rational jurors could disagree.  Thus, this factor also weighs against granting BCLC's motion for summary judgment.

### 5.    Actual Confusion

BCLC does not allege actual confusion between its GameSense mark and Defendant Gamesense's logo.  (Mem. at 17-18.)  Though BCLC cites a series of cases standing for the premise that an inability to identify "actual confusion" due to the recent emergence of a product is not "fatal" to a *Polaroid* analysis (Mem. at 17-18), a failure to show any consumer confusion

certainly does not weigh in favor of summary judgment for BCLC.  *See Virgin Enters. Ltd. V.*

*Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) ("It is self-evident that the existence of actual

consumer confusion indicates a likelihood of consumer confusion.  We have therefore deemed

evidence of actual confusion 'particularly relevant' to the inquiry.") (quoting *Streetwise Maps,*

*Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) (internal citation omitted)).

### 6.    Good Faith

The "good faith" factor in the *Polaroid* analysis "considers whether the defendant

adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any

confusion between his and the senior user's product."  *Arrow Fastener*, 59 F.3d at 397 (internal

quotation marks omitted).  A junior user's "actual or constructive knowledge *may* signal bad

faith," *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987), but

"[f]ull knowledge of a prior use of a protected mark is not necessarily inconsistent with a finding

of good faith, particularly where the alleged infringer is unsure as to the scope of the protection,"

*Cadbury Beverages*, 73 F.3d at 483.

It is undisputed that Ma, the creator of Defendant Gamesense's name, knew about

BCLC's "GameSense" mark before he applied for Defendant Gamesense's own trademark in the

field of video game accessories.  (Defs.' SOF ¶ 57.)  However, a rational trier of fact could find

that Ma lacked the requisite bad faith because he saw that GameSense was registered in

connection with responsible gambling education, a field he believes is sufficiently disconnected

from the video game accessories created by his company to prevent any consumer confusion.

(*See* Opp. at 22-26.)

Ultimately, Defendants are correct that a determination of bad faith is generally one best

reserved for a fact finder.  As the Second Circuit has "consistently" held, "subjective issues such

as good faith are singularly inappropriate for determination on summary judgment."  *Tiffany &*

*Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) (internal quotation marks

omitted).  In *Cadbury Beverages*, for example, the Second Circuit refrained from inferring bad

faith even when a junior user created an identical mark with "full knowledge" of the senior mark,

because the court reasoned that summary judgment was not the appropriate stage to determine

such a fact-based inquiry.  73 F.3d at 483.  Thus, this factor also weighs against summary

judgment for BCLC.

### 7.    Quality of Defendants' Product

"This factor is primarily concerned with whether the senior user's reputation could be

jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Arrow*

*Fastener*, 59 F.3d at 398.  BCLC does not contend that Defendants' products are of lower quality

than its own.  (Mem. at 20.)  Therefore, this factor does not weigh in favor of summary judgment

for BCLC.

### 8.    Sophistication of Consumers

The final factor in the *Polaroid* test considers whether there would be a likelihood of

confusion given "the general impression of the ordinary purchaser, buying under the normally

prevalent conditions of the market and giving the attention such purchasers usually give in

buying that class of goods."  *The Sports Auth.*, 89 F.3d at 965 (cleaned up).

BCLC argues that the participants in its GameSense programming "may be particularly

susceptible to confusion, as the relevant consumers are overlapping and constitute a wide range

of gaming participants, including casino gaming, lotteries, on-line and mobile gaming and video

gaming."  (Mem. at 19.)  Yet this argument relates back to the "proximity" factor above, as to

which the Court determined that rational triers of fact could disagree about the degree of overlap

of consumers in gambling and video game markets.

Because there remain unanswered questions of fact regarding the level of sophistication of GameSense programming participants and Defendant Gamesense accessory users, this factor also cuts against summary judgment.

Given that only one of the eight *Polaroid* factors weighs clearly in favor of BCLC's claim of customer confusion, BCLC's motion for summary judgment on its Lanham Act and New York common law claims is denied.

### B.    Injury to Business Reputation and Dilution

The only one of BCLC's claims that does not hinge on the *Polaroid* test is its injury to business reputation and dilution claim under Section 360-*l* of the New York General Business Law.  The statute states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. L. § 360-*l*.  And it "has been interpreted to provide for protection against both dilution by blurring and tarnishment."  *Starbucks*, 588 F.3d at 114.

Blurring is when "the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."  *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (internal quotation marks omitted).  The Second Circuit has developed a six-factor test to determine blurring, including:

> (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark.

*Id.*

Tarnishment occurs when "a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.* (internal quotation marks omitted).

Neither party addresses blurring or tarnishment directly, and the Court declines to spend significant time constructing either side's argument for them. *See Anderson*, 477 U.S. at 256 ("The movant has the burden of showing that there is no genuine issue of fact, but the [non-moving party] is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.").

Four of the five blurring factors present genuine disputes as to material facts. The sophistication of consumers, addressed in the *Polaroid* analysis above, remains unclear. *See supra* section III.A.8. The existence of predatory intent, similar to bad faith, is a subjective query generally inappropriate for resolution on summary judgment. *See Tiffany & Co.*, 971 F.3d at 88. And the degree of renown of both GameSense and Defendant Gamesense remains debatable to a rational trier of fact.

Further, given that BCLC has not alleged that Defendant Gamesense's products are of a lower quality or level of prestige than GameSense programming, *see supra* section III.A.7., tarnishment is not a viable theory of liability.

BCLC's motion for summary judgment on this claim is thus denied.

## IV.   Conclusion

For the foregoing reasons, BCLC's motion for summary judgment is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 23.

The parties are directed to confer and file a joint status letter on or before October 14, 2024, addressing (1) proposed jury trial dates from January 2025 through June 2025, with

anticipated number of trial days, and (2) whether the parties wish to be referred to the Court's

mediation program or the designated magistrate judge for a settlement conference.

      SO ORDERED.

Dated:  September 23, 2024
         New York, New York

                                              J. PAUL OETKEN
                                  United States District Judge